Case No. 22-1856

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

ELEANOR CANTER,

Plaintiff-Appellant

v.

DISABILITY NETWORK; CITY OF MUSKEGON;
FRANKLIN PETERSON; KIRK BRIGGS; GARY POST;
BRAD HASTINGS; DIANE FLESER,

Defendants-Appellees

---

## ON APPEAL FROM THE U.S. DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

---

## BRIEF ON APPEAL OF DEFENDANTS-APPELLEES
## CITY OF MUSKEGON AND FRANKLIN PETERSON

### *** ORAL ARGUMENT REQUESTED***

Douglas J. Curlew (P39275)
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI 48152
Ph: (734) 261-2400
Attorneys for Defendants-Appellees
City of Muskegon and Franklin Peterson

{01752605-1}

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: **22-1856**          Case Name: **Canter v. Disability Network, et al.**

Name of counsel:  **Douglas J. Curlew**

Pursuant to 6th Cir. R. 26.1, **City of Muskegon and Franklin Peterson**
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

### CERTIFICATE OF SERVICE

I certify that on _____ **September 28, 2022** _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/**Douglas J. Curlew**
**17436 College Parkway**
**Livonia, MI 48152**

**This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.**

### 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure.** With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement. A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed.**

(1) Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal. A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2) Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure.** The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................... iii

Statement Requesting Oral Argument .................................... vi

Jurisdictional Statement ............................................................ 1

Counter-Statement of Questions Presented .......................... 2

Counter-Statement of the Case ............................................... 3

Summary of Argument.............................................................. 35

Argument.................................................................................... 37

I.    THE STANDARD OF APPELLATE REVIEW IS *DE NOVO* ..................... 37

II.   PLAINTIFF-APPELLANT CANTER BEARS THE BURDEN OF PROOF FOR HER "CONSPIRACY" ALLEGATIONS ................................ 37

III.  THE EVIDENTIARY RECORD DOES NOT SUPPORT ANY "INFERENCE OF CONSPIRACY" .................................................. 39

IV.  THE EVIDENTIARY RECORD DOES NOT SUPPORT ANY FINDING OF "RETALIATION" BY FRANKLIN PETERSON OR THE CITY OF MUSKEGON ................................................................. 43

V.   FRANKLIN PETERSON IS ENTITLED TO QUALIFIED IMMUNITY AGAINST CANTER'S CLAIMS .................................................. 49

VI.  THERE IS NO BASIS FOR MUNICIPAL LIABILITY ON THE PART OF THE CITY OF MUSKEGON ................................................... 51

VII. THE DISTRICT COURT CORRECTLY DISMISSED CANTER'S STATE-LAW CLAIM UNDER MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT............................................ 52

VIII. THERE IS NO BASIS FOR AN ADA COMPLIANCE CLAIM AGAINST THE CITY OF MUSKEGON OR PETERSON ......................... 52

Conclusion and Relief Requested .......................................................... 54

Certificate of Compliance ...................................................................... 55

Certificate of Service............................................................................. 55

Record Appendix Making Designation of Documents ........................................... 56

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)............................................. 38, 44

*Apple v. Glenn*, 1843 F.3d 477 (6th Cir. 1999)................................................ 36, 46

*Armstrong v. Shirvell*, 596 Fed. Appx. 433 (6th Cir. 2015) ................................. 41

*Beck v. Prupis*, 529 U.S. 494 (2000)...................................................................... 40

*Burden v. Elias Brothers Big Boy Restaurants*, 240 Mich. App. 723,
613 N.W.2d 378 (2000) .................................................................................. 40-41

*Burnett v. Griffith*, 33 F.4th 907 (6th Cir. 2022) .................................................. 52

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .................................................. 35, 39

*E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015)................................... 46

*Doe v. City of Detroit, Michigan*, 3 F.4th 294 (6th Cir. 2021) ....................... 36, 39

*Dye v. Office of the Racing Commission*, 702 F.3d 286 (6th Cir. 2012) ............ 48

*Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012)............................................. 40

*K.V.G. Properties, Inc. v. Westfield Insurance Company*, 900 F.3d
818 (6th Cir. 2018)....................................................................... 35, 39, 45

*Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)......... 46

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ....................... 35, 38

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................ 48

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ............................... 37

*Monell v. Dept of Social Services of City of New York*, 436 U.S. 658 (1978) ... 51

*Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) ........................ 52

*Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274 (1977) ................................................................................................ 47

*Mullenix v. Luna*, 577 U.S. 7 (2015) .................................................................. 50

*Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct. 1715 (2019)................................ 46, 47

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................ 36, 49, 50

*Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791 (6th Cir. 2018) .......................................................................................... 48-49

*Puskas v. Delaware County, Ohio*, 56 F.4th 1088 (6th Cir. 2023)...................... 37

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014) .................................................. 51

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ........... 47-48

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014)................................................ 40

*Spector v. Norwegian Cruise Line, Ltd.*, 545 U.S. 119 (2005) ........................... 53

*Sumpter v. Wayne County*, 868 F.3d 473 (6th Cir. 2017) .................................... 49

*TT v. KL*, 334 Mich App 413, 965 N.W.2d 101 (2020) ........................................ 40

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) .............................. 43, 44, 47

*Tucker v. City of Richmond, Kentucky*, 388 F.3d 216 (6th Cir. 2004) ............... 51

*U.S. v. Johnson*, 440 F.3d 832 (6th Cir. 2006) ..................................................... 45

*Vereecke v. Huron Valley School Dist.*, 609 F.3d 392 (6th Cir. 2010).......... 36, 51

*Wiley v. City of Columbus, Ohio*, 36 F.4th 661 (6th Cir. 2022)........................... 37

*Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018)................................... 52

## <u>Statutes</u>

28 U.S.C. §1291 ............................................................................. 1

42 U.S.C. §12203(a) ..................................................................... 43

## <u>Rules</u>

Fed. R. Civ. P. 56 .................................................................... 37, 38

Fed. R. Civ. P. 56(a) ................................................................... 37

## <u>Regulation</u>

29 C.F.R. §33.13 ........................................................................ 43

## <u>STATEMENT REQUESTING ORAL ARGUMENT</u>

Defendants-Appellees City of Muskegon and Franklin Peterson request oral argument.  The principal brief  by Plaintiff-Appellant Eleanor Canter is predicated upon mischaracterization of the record and the law.  It is anticipated that similar mischaracterizations will appear in Canter's reply brief. Oral argument will be the Defendants-Appellees' only opportunity to rebut such mischaracterizations in Canter's reply.

# JURISDICTIONAL STATEMENT

Canter correctly recites that this Court has jurisdiction by authority of 28 U.S.C. §1291.

# <u>COUNTER-STATEMENT OF QUESTIONS PRESENTED</u>

I.    SHOULD SUMMARY JUDGMENT IN FAVOR OF THE CITY OF MUSKEGON AND FRANKLIN PETERSON BE AFFIRMED ON THE GROUND THAT PLAINTIFF-APPELLANT ELEANOR CANTOR FAILED TO PRESENT EVIDENCE TO SUPPORT HER CLAIMS?

Appellant Canter answers: "No."

Appellees City of Muskegon and Franklin Peterson answer: "Yes."

II.   SHOULD SUMMARY JUDGMENT IN FAVOR OF PETERSON ALSO BE AFFIRMED ON THE GROUND OF QUALIFIED IMMUNITY?

Appellant Canter answers: "No."

Appellees City of Muskegon and Peterson answer: "Yes."

III.  SHOULD SUMMARY JUDGMENT IN FAVOR OF THE CITY ALSO BE AFFIRMED ON THE GROUND THAT CANTER HAS NO EVIDENCE OF CITY POLICY OR ACTION WHEREBY MUNICIPAL LIABILITY COULD ARISE?

Appellant Canter answers: "No."

Appellees City of Muskegon and Franklin Peterson answer: "Yes."

## COUNTER-STATEMENT OF THE CASE

### Introduction.

Plaintiff-Appellant Eleanor Canter presents herself as an advocate for the rights of the disabled. She claims that the Defendants-Appellees conspired to retaliate against her advocacy in violation of the First Amendment, the Americans with Disabilities Act, the Rehabilitation Act and Michigan's Persons with Disabilities Civil Rights Act.

Canter expressly relies upon *"is all the emails going back and forth between the different parties."* **(R. 109-1, Pg ID 995, Canter Dep., 8/5/21, p. 92, lines 6-7).** Supposedly, these emails make the alleged conspiracy *"real obvious."* **(R. 109-1, Pg ID 995-996, 998, Canter Dep., 8/5/21, pp. 92-93, 104, lines 14-15).** But when the emails are read, Canter's interpretation is shown to be utter fantasy.

Canter has never been subjected to "retaliation," nor has her advocacy been "chilled." The Defendants-Appellees have consistently responded to Canter's complaints and criticisms – with the City of Muskegon, through City Manager Franklin Peterson, even scheduling a special meeting for Canter to confront City officials with her grievances.

Indeed, Canter acknowledged at deposition that *"I'm still allowed to speak"* and *"I'm doing advocacy right now."* **(R. 109-2, Pg ID 1058, Canter Dep., 8/11/21, p. 58).**

The situation is that the Defendants-Appellees simply disagree with Canter's interpretation of ADA regulations, such that her advocacy has not achieved the *result* to which Canter believes herself entitled.  But merely being denied the "result" for which one advocates cannot support a finding of "retaliation."

Rather, Canter must present evidence that her desired result would not have been denied "but for" a retaliatory motive on the part of the Defendants-Appellees. Canter has no such evidence.

### Substantive Facts.

Canter asserts that "*[t]his case centers on the Heritage Square Commons building in Muskegon*." **(Canter Appellate Brief, p. 3)**.  But the supposed lack of ADA accessible entrances at the Heritage Square Commons (HSC) building is not the "center of this case.  As Canter herself summarizes her case, "*[t]his lawsuit challenges a coordinated effort to retaliate and silence*" Canter's "*advocacy,*" "*demand for compliance with the Americans with Disabilities Act,*" and "*protected criticism of local officials.*" **(Appellant Canter's Brief, p. 24)**. This case "centers" upon the supposed retaliation against Canter for her "advocacy," her "demand" and her "criticism," not upon the accessibility of the HSC building per se.[1]

Canter's conspiratorial interpretation of the emails surrounding the HSC is a

---

[1] Indeed, Canter has admitted that the City of Muskegon and its municipal officials "*are not responsible for enforcement of the ADA.*"  **(R. 109-1, Pg ID 997, Canter Dep., 8/5/21, p. 100)**.

manifestation of Canter's long-standing hostility toward Disability Network West Michigan (DNWM). Specifically, Canter opposes the manner of advocacy espoused by Diane Fleser (the DNWM CEO) and Brad Hastings (the DNWM "Advocacy and ADA Coordinator").

From 2003 to 2005 Canter was a volunteer "community organizer" for the DNWM. **(R. 103-3, Pg ID 611, Canter Dep., 9/18/20, p. 15)**. But Canter's "square one" for disability advocacy is "consumer control." **(R. 111-1, Pg ID 1308, Canter Email, 4/19/19 @ 6:10 p.m.)**. Canter believes that disabled people themselves (the "consumers") should have a direct role in advocacy on their behalf. **(R. 103-3, Pg ID 616, Canter Dep., 9/18/20, p. 33)**. She believes that the DNWA wrongly measures its legitimacy by having a certain percentage of disabled staff and Board members. **(R. 103-4, Pg ID 647, Canter Dep., 9/22/20, p. 20)**.

Canter claims the environment at DNWM became "hostile" when "a lot of nondisabled people being brought on board," who supposedly oppose her "consumer-based advocacy approach." **(R. 103-3, Pg ID 613, Canter Dep., 9/18/20, p. 21)**. As Canter summarizes:

> At Disability Network West Michigan, disabled people engaging in consumer driven advocacy is not welcome and its not acceptable to them. That's why they can't serve me. It's really a cultural problem with the leadership of that organization.
>
> **(R. 109-1, Pg ID 989, Canter Dep., 8/5/21, p. 67)**.

Canter is now "communication coordinator" for an alternative disability advocacy group, i.e., the National Council on Independent Living. **(R. 103-3, Pg ID 613, Canter Dep., 9/18/20, pp. 22-23; R. 109-1, Pg ID 976, Canter Dep., 8/5/21, p. 16)**. Canter has also organized a separate "consumer-controlled advocacy group," the Disability Justice League, which rejects participation by DNWM staff, whom Canter accuses of "think[ing] their job is to interfere with and derail consumer-driven advocacy." **(R. 111-1, Pg ID 1308, Canter Email, 4/19/19 @ 6:10 p.m.)**. Rather ironically, Diane Fleser (now CEO of the DNWM) was a co-founder of the Disability Justice League. **(R. 103-3, Pg ID 614-615, Canter Dep., 9/18/20, pp. 28-29; R. 103-7, Pg ID 673, Fleser Declaration, ¶ 3; R. 103-13, Pg ID 694, Fleser Affidavit, 3/9/20, ¶ 1)**. But Canter became convinced that Fleser was "interfering in our advocacy . . . [a]nd I told her I would no longer allow her to be a part of the group." **(R. 103-3, Pg ID 615, Canter Dep., 9/18/20, p. 29)**.

Canter also volunteers for the "Peer Action Alliance." **(R. 103-3, Pg ID 613, Canter Dep., 9/18/20, p. 24)**. According to Canter, she and her mother (Dharma Canter) write the Peer Action Alliance blog and run the organization's Facebook page. **(R. 103-3, Pg ID 614, Canter Dep., 9/18/20, pp. 27-28)**.

Of particular importance to Canter's criticism, the DNWM offers architectural "accessibility reviews" to private businesses. **(R. 103-5, Pg ID 660-661, DNWM Blog Post)**. Brad Hastings conducts the reviews. **(R. 103-6, Pg ID 667-668,**

**Hastings Affidavit, ¶¶ 3, 6, 9).**

Canter claims that the access reviews are "falsified" and that the DNWM promises "not to report violations of state and federal law in exchange for cash." **(R. 103-16, Pg ID 711, Canter Email, 8/24/19 @ 11:04 a.m.; R. 109-13, Pg ID 1209, Canter Email, 8/27/19 @ 9:12 p.m.).** Canter has posted that the DNWM has violated its "responsibilities under the law" by using a "non-disabled advocacy coordinator" with "inadequate training" (i.e., Hastings) to "sell fraudulent access reviews to anyone who pays them off." **(R. 111-9, Pg ID 1376, Eleanor Canter Facebook Post).** Yet while Canter has acknowledged that the access reviews were offered for "free." **(R. 103-3, Pg ID 621, Canter Dep., 9/18/20, p. 54; R. 103-5, Pg ID 660, DNWM Blog Post).**

In November 2018, the HSC became focus of Canter's criticism. According to Canter, she tried to attend an event at the Drip Drop Drink Coffee shop, within the HSC, but "the accessible entry had a locked door." **(R. 109-2, Pg ID 1050-1051, Canter Dep., 8/11/21, pp. 50-51).**

Canter identified this incident as occurring on December 13, 2018. **(R. 109-2, Pg ID 1050, Canter Dep., 8/11/21, p. 50).** But Canter had complained about the HSC two weeks earlier by a November 28, 2018, email to Kirk Briggs and Franklin Peterson. Briggs conducts inspection services for the City. **(R. 131, Pg ID 2755,**

**Joint Statement of Undisputed Material Facts, ¶ 5-6).**[2] Peterson served as City Manager for Muskegon from September 2013 to April 1, 2022. **(R. 131, Pg ID 2754, Joint Statement of Undisputed Material Facts, ¶ 2).** In her email, Canter complained that the Drip Drop "does not appear to have an accessible entrance." **(R. 106-3, Pg ID 912, Canter Email, 11/26/18 @ 10:40 a.m.).**

Peterson responded that there was an accessible door with a ramp. **(R. 106-3, Pg ID 912, Peterson Email, 11/26/18 @ 10:48 a.m.).** The ramped entrance can be seen in the front of the building (*immediately next to the coffee shop main door*) and is shown by an architectural diagram to lead to a hallway affording access to the coffee shop. **(R. 115-1, Pg ID 1593, 1594, Photographs; R. 115-2, Pg ID 1597, Diagram).**

That same day, Briggs emailed Gary Post (the developer) reminding him that the doors providing the ramp entrance to the Drip Drop Drink "*should be left unlocked during business hours.*" **(R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:38 p.m.).** Post assured Briggs that he would contact the shop owners. **(R. 106-3,**

---

[2] The City hired SAFEBuilt as an "independent contractor" to provide an inspector with "experience" and "expertise" in the interpretation and application of building codes. **(R. 106-2, Pg ID 878, 885-886, "Professional Services Agreement," at "Recitals and Representations" and §§2.2 and 11.1.** Briggs was hired as "Chief Building Official and Building Inspector, acting as an employee of SAFEBuilt on behalf of the City of Muskegon. **(R. 106-4, Pg ID 929-930, Briggs Affidavit, ¶¶ 3-5, 8).**

**Pg ID 911, Post Email, 11/26/18 @ 4:50 p.m.**). Briggs reiterated that "the ramp is what you need for ADA to the building." (**R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:54 p.m.**

The next day, Briggs forwarded Canter's complaint to Post - - and admonished Post to *"please understand that ADA compliance is critical."* (**R. 106-3, Pg ID 913, Briggs Email, 11/27/18 @ 3:25 p.m.**). Post assured Briggs that he had spoken with the coffee shop owner about keeping the door open. (**R. 106-3, Pg ID 913, Post Email, 11/27/18 @ 3:41 p.m.**).

Briggs then sent an email to Canter. That email reads:

> Eleanor, thank you for your input, we have reviewed chapter 1105 and the code requires 60% of the entrances into a building, or as required by other parts of chapter 1105. Drip Drop Drink is only part of a building and that building must meet the 60% ADA. there are 5 entrances into that building 3 of them are ADA compatible, this complies with the 60%. If you feel there should be more accessibility you can contact Gary Post direct. You will find that he is a very nice and approachable person.
>
> *If you would like to review the code with me you are welcome to stop up to my office and I will certainly spend time with you.* I am willing to review with you many of the entrances in the Muskegon area. We could even work together to develop a ADA complaint form to get you better results.
>
> *You are also welcome to stop in the office and review any permits that are in the plan review stage at any time.*
>
> (**R. 106-3, Pg ID 914-915, Briggs Email, 11/28/18 @ 3:37 p.m.,** *emphasis added*).

Briggs' emails demonstrate three key points.

First, Briggs took the position that *"ADA compliance is critical,"* and he insisted that Post address the problem of the locked door). **(R. 109-2, Pg ID 1050-1051, Canter Dep., 8/11/21, pp. 50-51)**. Briggs did not oppose Canter's advocacy. He supported her.

Second, Briggs acknowledged that the ADA required 60% of the building entrances to be accessible to the disabled. This demonstrates the falsity of Canter's assertion that *"Briggs and Peterson happily adopted [Brad] Hastings' guidance"* in this regard. **(Appellant Canter's Brief, p. 61)**. Hastings had no involvement with issues surrounding the Heritage Square Commons building, until two days *after* Briggs' email - - when Hastings emailed a complaint of his own. **(R. 115-5, Pg ID 1603, Hastings Email, 11/30/18 @ 9:46 a.m.)**. Briggs, and thus the City, had reached their conclusion regarding ADA 60% accessibility requirements at the HSC independently - - before any involvement by Hastings.

Third, Briggs was willing to meet with Canter to review existing and pending project throughout Muskegon. Such offer was never withdrawn. Indeed, the offer was repeated by City Manager Peterson at a meeting with Canter on April 5, 2019.

But Canter was not satisfied. She contended that some entrances to the HSC building were "restricted," not "public," and that only one of the public entrances was accessible, such that the 60% requirement was not met. **(R. 106-3, Pg ID 914,**

**Canter Email, 12/2/18 @ 12:28 p.m.).**

Brad Hastings and Diane Fleser at the DNWM were no less concerned than

Canter. In a November 30, 2018, email to Peterson, Hastings complained to City

Manager Peterson that:

> The new Drip Drop Drink located at 926 Second Street,
> lacks an accessible entrance. . . . As this is new
> construction and is a place of public accommodation, it is
> required to be accessible and to meet the 2010 Standards
> of Accessibility. I am curious how something like this was
> not caught in the design or building inspection phase? I
> would like to know how we can be part of the planning
> process to prevent this from happening in the future? Any
> guidance would be greatly appreciated.
>
> **(R. 115-5, Pg ID 1603, Hastings Email, 11/30/18 @ 9:46
> a.m.).**

Canter acknowledges that Hastings "identified the same concerns raised by Canter."

**(Appellant Canter Brief, p. 4).**

Diane Fleser also emailed Peterson that:

> The aforementioned door to the right [of the coffee shop]
> creates a barrier because it is locked to the public (at least
> currently). Some additional signage notifying the public
> that an additional "accessible" entrance exists is a good
> low hanging solution to move forward with. Additionally,
> however, with our expertise and motivated willingness to
> be on the front end of these concerns we certainly covet
> the opportunity to positively influence these types of plans
> moving forward by working together (to Brad's larger
> point). Suffice to say, the design at Drip, Drop, Drink is
> an unfortunate example of a missed opportunity.
>
> **(R. 115-12, Pg ID 1632, Fleser Email, 12/5/18 @ 8:51**

a.m.).

Post responded with his belief that the building "complied with all building codes as they relate to accessibility." **(R. 115-7, Pg ID 1622, Post Email, 12/6/18 @ 9:24 p.m.).** Fleser replied that "I believe there are still valid concerns relating to accessibility that will be beneficial to explore." **(R. 115-7, Pg ID 1622, Fleser Email, 12/11/18 @ 3:42 a.m.).**

Hastings replied that:

> I have now spoken with the Access Board (the body that writes the Accessibility Standards) and the Department of Justice (the body responsible for enforcing them). *Both entities believe that this is an ADA violation*, meaning that it is discriminatory to require persons with mobility impairments to use a separate entrance that requires a buzzer when ambulatory people can use the unlocked front door without a buzzer. *While it is okay for them to have a separate Accessible entrance*, it is not okay for it to be locked, with a buzzer required for access. *This route needs to be unlocked during business hours*. . . . There also needs to be signage indicating where the Accessible entrance is.
>
> **(R. 115-11, Pg ID 1631, Hastings Email, 12/11/18 @ 4:53 p.m., *emphasis added*).**

Thus Hastings, like Briggs, had researched the issue and determined the problem to be the locked door.

But Hastings also admonished that:

> Additionally, it is important to remember that these standards are the absolute BARE MINIMUM of what is considered accessible.

**(R. 115-11, Pg ID 1631, Hastings Email, 12/11/18 @ 4:53 p.m.).**

Briggs, too, consulted with other authorities. He learned from state regulators the same thing that Hastings had been told by the Access Board. Briggs summarized that *"[a]ccording to them this building does comply, however the door with the ramp should not be locked during business hours."* **(R. 115-9, Pg ID 1628, Briggs Email, 12/12/18 @ 2:52 p.m.**

Thus, Briggs, on behalf of the City, was determined to ensure compliance with the ADA and had sought to confirm his own interpretation of the ADA with state-level authorities. He was also willing to meet with Hastings to address ADA accessibility issues - - *just as he had offered to meet with Canter to that end*. **(R. 115-9, Pg ID 1628, Briggs Email, 12/12/18 @ 2:52 p.m.).**

Hastings replied that "the immediate next steps are to make sure that there is adequate signage to indicate where the accessible route and . . . that the door to the accessible entrances be unlocked during business hours." **(R. 115-10, Pg ID 1629, Hastings Email, 12/13/18 @ 2:01 p.m.).** Post sent an email asking Hastings for recommendations regarding "the appropriate verbiage" for the sign. **(R. 115-10, Pg ID 1629, Post Email, 12/13/18 @ 11:27 p.m.).**

Canter emailed Hastings to ask whether he was "intervening in the Drip Drop Drink issue." **(R. 115-16, Pg ID 1639, Canter Email, 12/14/18 @ 1:02 p.m.).** But

Hastings had already done so. Moreover, Hastings and Fleser met directly with Post and Briggs to press their concerns. **(R. 115-18, Pg ID 1641, Hastings Email, 1/22/19 @ 9:36 p.m.).**

There is no evidence that Canter ever availed herself of the offered opportunity to meet with Briggs and review accessibility issues. Nor is there any evidence that Canter ever availed herself of the same offer when reiterated later by Franklin Peterson.

But Hastings - - consistent with his concern that the deficiencies of the HSC were "not caught in the design or building inspection phase" (*and with Fleser's concern to address such matters "on the front end" to avoid another "missed opportunity"*) - - took initiative to obtain a more proactive platform. Hastings' next email in the record is an inquiry to Peterson asking whether "there has been any progress of appointing me to the Downtown Development Authority." **(R. 115-17, Pg ID 1640, Hastings Email, 1/7/19 @ 7:52 p.m.).** Evidently such appointment occurred. **(R. 115-19, Pg ID 1642, Post Email, 1/25/19 @ 2:44 a.m.).** What Canter describes as "conspiracy" was an effort by the DNWM to do its job - - i.e., to advocate for accessibility during the planning phase of local projects.

Critically - - *despite* his appointment to the DDA and *despite* his meeting with Post and Briggs - - <u>Hastings did not relent in his *criticism*</u> of Post's HSC building. On January 22, 2019, Hastings reiterated the requirement for a sign showing the

accessible route - - and emphasized that "[t]he entrance needs to be unlocked during business hours." **(R. 115-18, Pg ID 1641, Hastings Email, 1/22/19 @ 9:36 p.m.).**

Post confirmed that leaving the door unlocked was "OK." **(R. 115-19, Pg ID 1642, Post Email, 1/25/19 @ 2:44 a.m.).** The emails from Briggs, Hastings and Fleser had demonstrably made Post aware of his obligation, and Post indicated an intent to do so.

On March 1, 2019, Canter emailed Post asking whether he had a plan to bring HSC "into compliance with the ADA?" **(R. 115-20, Pg ID 1644, Canter Email, 3/1/19 @ 12:20 p.m.).** In seeming reference to the same meeting mentioned by Hastings' email of January 22nd, Post responded that:

> We met a few weeks ago with Brad Hastings from the Disability Network and Kirk Briggs from SafeBuilt, the city of Muskegon's inspection department. It was a very good meeting and we all agreed that we were in compliance with ADA.

**(R. 115-20, Pg ID 1644, Post Email, 3/4/19 @ 7:33 a.m.).**

Post's response *ignored* the continuing concerns raised by Hastings, Fleser and Briggs that the accessible doors must be kept unlocked. Post also failed to mention Hastings' admonition that signage and unlocked doors were *"the absolute BARE MINIMUM of what is considered accessible."* **(R. 115-11, Pg ID 1630, Hastings Email, 12/11/19 @ 4:53 p.m.; R. 115-18, Pg ID 1641, Hastings Email, 1/22/19 @ 9:36 p.m.).**

But Post's _inaccurate_ description became a trigger for Canter. (**R. 115-16, Pg ID 1639, Canter Email, 12/14/18 @ 1:02 p.m.**). Canter emailed Hastings demanding to know "is this an accurate description, Brad?" (**R. 103-8, Pg ID 679, Canter Email, 3/4/19 @ 9:01 a.m.**).

Hastings emailed Fleser that Post's email to Canter was "_not_" an "accurate description." Hastings explained that:

> I now have an email from Eleanor asking if this is an accurate description. _It is not_. We discussed that IF they made sure that the other door was unlocked during business hours and they provided signage to indicate the accessible route, they would be meeting BARE MINIMUM access requirements. We are not an enforcement agency for the ADA so, we cannot tell anyone whether or not they are in compliance. All we can do is provide guidance. Unfortunately, in this case, Port City CDS has opted to do the bare minimum to providing access instead of making the main entrance accessible, which is the intent of the standards. I consulted with both the US Access Board and the Department of Justice on this issue and did not make this judgment alone.
>
> (**R. 115-20, Pg ID 1644, Hastings Email, 3/4/19 @ 10:17 a.m.,** _emphasis added_).

In an email to Hastings the next day, Canter complained that:

> This question requires a response. I think we deserve to know if our CIL [_i.e., the DNWM_] is sabotaging consumer advocacy and giving cover to entities violating the ADA.
>
> _Did the CIL get paid to sell us out, or did Brad just wet his pants as soon as he got in a room with two other powerful non-disabled white men?_

Obviously, Heritage Square Commons is not ADA compliant, and Brad knows that because I sent him the relevant standards months ago. So what's going on here?

This is truly a new low. If you have anything to say for yourselves, now is the time.

**(R. 103-8, Pg ID 679, Canter Email, 3/5/19 @ 8:59 a.m.,** *emphasis added*).

Fleser interjected herself into the exchange, admonishing Canter that:

First and foremost, initiating an attack on a member of my team is completely unacceptable and is nothing anyone should have to tolerate - - I certainly will not. Our goals center around personal empowerment and positive social change for people with disabilities; *your tactics to belittle and bully, are not conducive to advancing our mission* and frankly do not warrant a response, speaking of "new lows." *Your attempts to communicate often result in failed exchanges because of the hostile platform you pursue.* Here's what I believe you need to know and I believe Brad is sending a courtesy follow-up as well.

*We will continue to work with communities, to educate them on their responsibilities*, to promote inclusion and accessibility, to share the great opportunities businesses have by expanding their markets, to educate on population demographics that include a very large aging population who would also like access to goods and services *and we will especially continue to work upstream to ensure these considerations are the forefront of plans and concept development*. As you may know, although the minimum guidelines of the ADA may meet the letter of the law, it certainly does not embrace the spirit of the law which speaks to FULL inclusion of all citizens in all areas of community life. Unfortunately, the ADA is a law that sets minimum guidelines to ensure equal access and opportunity for people with disabilities; these minimum guidelines do not ensure that a business is disability-

friendly or even that it is accessible at a practical level. Yes, WE KNOW THIS and push beyond the bare minimum in every interaction we have, including with Mr. Post. He knows what he has to do.

**(R. 103-8, Pg ID 678-679, Fleser Email, 3/5/19 @ 4:04 p.m.,** *emphasis added***).**

Not willing to back down, Canter then let loose her criticism on Fleser, stating:

You don't get to exploit our advocacy, use our civil rights law as an opportunity to make a quick buck, and then turn yourselves into the victim. What you're doing is illegal, outrageous, and in total contradiction to everything the Independent Living Movement stands for.

Your privilege is showing and it is disgusting.

You're being extremely disrespectful to me and to the entire disability community - - daily. You don't get to demand that we respond with deference to your make-believe authority.

**Interference in our advocacy needs to stop immediately.**

Signage will not bring Heritage Square Commons into compliance with the ADA. *Every time you make that statement, you participate in a crime. Brad's statements to the contrary are absurd.*

You're in way over your head here and it needs to stop.

**(R. 103-8, Pg ID 678, Canter Email, 3/7/19 @ 9:03 a.m.,** *emphasis in original***).**

Hastings responded by citing an "ADA Guide for Small Businesses" that he believed permitted the adjacent entry arrangement, but he reiterated the DNWM

position that the door must be unlocked.  **(R. 115-24, Pg ID 1649, Hastings Email,**

**3/5/19 @ 4:18 p.m.).**  He also emphasized that:

> You should know that in assessing this situation, I *did not only rely on my own training and technical education of the ADA.  I reached out to other Certified ADA Coordinators, as well as the U.S. Access Board and the Department of Justice.*  It was concluded that while the intent of the standards is to make the main entrances accessible, Port City would meet the bare minimum requirements if the door remained unlocked during business hours and signage was provided to indicate an accessible route.

> **(R. 115-24, Pg ID 1649, Hastings Email, 3/5/19 @ 4:18 p.m.,** *emphasis added***).**

Hastings also added that:

> I also want you to know that while you and I have not worked together on this, I indeed have input and support from people from with significant disabilities EVERY DAY.  I have also spent hundreds of hours studying the ADA, connecting to individuals and other experts across the country and am greatly passionate about my role.  It has been my observation that *your approach pushes people away from the table,* just as you have pushed us away.  *I am building relationships and getting people excited to work with us and learn about accessibility and inclusion.*

> **(R. 115-24, Pg ID 1649, Hastings Email, 3/5/19 @ 4:18 p.m.,** *emphasis added***).**

Hastings also added the postscript that: *"If you think they are violating the ADA,*

*please note that you can file a complaint against a Title III entity,* [i.e. Post and the

HSC] *with the United States Department of Justice."*  **(R. 115-24, Pg ID 1649,**

**Hastings Email, 3/5/19 @ 4:18 p.m.).**

Canter then accused Hastings of "sabotaging our advocacy efforts and lying to our faces about it" - - with "our" presumably meaning Canter and the consumer-focused groups she favored. **(R. 115-21, Pg ID 1645, Canter Email, 3/6/19 @ 9:28 a.m.).** Canter contended that the "ADA Guide for Small Businesses" is outdated and "irrelevant," because it does not address new standards released in 2010. **(R. 115-21, Pg ID 1645, Canter Email, 3/6/19 @ 9:28 a.m.).** Canter's attitude toward Hastings was again manifested in Canter's closing statement that:

> This is extremely embarrassing for you. I'd be careful about how you proceed. You're tiptoeing right up to participating in a conspiracy. I'd also suggest familiarizing yourself with the ADA's interference and administrative methods section. *You are violating the ADA right now.*
>
> You need to know a lot more about the ADA before you give legal advice on subjects with such profound potential consequences. Your response disqualifies you from any further "expertise" on this subject.
>
> **(R. 115-21, Pg ID 1645, Canter Email, 3/6/19 @ 9:28 a.m.,** *emphasis in original*).

Hastings responded that he had "contacted the relevant authorities" (*being the United States Department of Justice and the United States Access Board*) and that he had "proceeded with their guidance and suggestions." **(R. 115-61, Pg ID 1616, Hastings Email, 3/6/19 @ 10:38 a.m.).** Canter rejected this, stating that contact with the Department of Justice and Access Board was "not a believable story." **(R.**

**115-6, Pg ID 1616, Canter Email, 3/6/19 @ 6:39 p.m.).**

Canter then emailed Post and "city representatives" asserting that Briggs "either does not understand the code or is engaged in a cover-up of a mistake, and she demanded to know if anybody at the City was "competent" or "uncompromised." **(R. 106-3, Pg ID 919-920, Canter Email, 3/10/19 @ 11:02 a.m.).** Canter accused Hastings of misinterpretation and a "ridiculous performance" - - noting that she had filed "complaints about Brad's behavior to the DOJ, Access Board, the Independent Living Administration, and the entity that supposedly 'certified' him." **(R. 106-3, Pg ID 920, Canter Email, 3/10/19 @ 11:02 a.m.).**

But Hastings showed himself to be diligent. In an email to Briggs, Post and Peterson, Hastings advised that:

> I just wanted to follow-up and inform you that I have sent a follow-up email to the Access Board with the floor plan of the lower level of Heritage Square Commons attached and explanations of which entrances are ramped and open during business hours. I will let you know when I hear anything back. *If they tell me that I have made a mistake and given poor guidance, I will admit that.* I tried my best to do my due diligence in this scenario and *if somehow I misrepresented the situation on my first inquiries, I will apologize and be better in the future. In any case, it was certainly not my intent to squash the advocacy of members of the disability community, but to support it by providing accurate technical information with the council [sic] of the federal authorities on the subject.*
> It was also made clear in our meeting with Gary, Kevin, and Kirk, that *even if this does meet the standard, the standards set a bare minimum and future projects should provide much greater accessibility* so that Muskegon can

become a more inclusive community. I look forward to hearing from the Access Board so we can straighten this out.

**(R. 115-26, Pg ID 1645, Hastings Email, 3/11/19 @ 9:29 a.m.,** *emphasis added***).**

Hastings did not include Canter as a recipient of this email, so the email was not an attempt by Hastings to look humble for her.

When Hastings received an answer from the Access Board, he reported:

I just got off the phone with the U.S. Access Board.

. . .

After a somewhat lengthy conversation, *they confirmed the original conclusion, which was that the building could have been designed with much greater accessibility, but it does comply with the bare minimum standards as long as the ramped front entrance is unlocked during business hours and there is signage indicating the accessible route.* I look forward to working together in the future to avoid these types of scenarios.

**(R. 115-27, Pg ID 1656, Hastings Email, 3/12/19 @ 3:19 p.m.,** *emphasis added***).**

But on March 20, 2019, Canter again emailed Hastings and Fleser that the 2010 ADA standards required "that 60% of entrances are accessible," and she characterized Hastings' position to be "extremely embarrassing for you." **(R. 111-1, Pg ID 1290, Canter Email, 3/20/19 @ 8:31 a.m.).**[3]

---

[3] It should be remembered that Briggs, on behalf of the City, had been proceeding under this "60%" standard from the 2010 ADA standards all along and had

Hastings emphatically denied ever saying that the 2010 ADA standards did not apply - - and he *back-tracked* from his earlier reference to the 1999 Small Business Guide. **(R. 111-1, Pg ID 1292, Hastings Email, 3/21/19 @ 4:04 p.m.).** He reiterated, however, his opinion that the "Heritage Square Commons does meet the 60% requirements" of the 2010 ADA. **(R. 111-1, Pg ID 1292, Hastings Email, 3/21/19 @ 4:04 p.m.).** Quoting the definition of "restricted entrances" from the 2010 ADA standards, Hastings emphasized that the accessible entrances that Canter deemed to be "restricted" (and therefore not part of the 60% calculation) *"are actually considered 'public,' meaning 3/5 (60%) of 'public entrances' are accessible."* **(R. 111-1, Pg ID 1292, Hastings Email, 3/21/19 @ 4:04 p.m.).**

Peterson (*who has made no claim to personal ADA expertise*) found Hastings' interpretation - - atop the *identical original assessment* by Briggs - - to be persuasive. Peterson reiterated Hastings' explanation in an email. **(R. 111-1, Pg ID 1294-1295, Peterson Email, 3/22/19 @ 2:43 p.m.).**

Canter rejected Hastings' conclusions as "non-sensical," suggesting that Hastings and the DNWM were willing "to just make this stuff up." **(R. 111-1, Pg ID 1296, Canter Email, 3/23/19 @ 11:14 a.m.).** She accused the City and DNWM of "trading favors for favorable . . . legal advice" as part of "a quid pro quo." **(R.**

---

confirmed it to Canter, even before Hastings ever became involved. **(R. 106-3, Pg ID 914-915, Briggs Email, 11/28/18 @ 3:37 p.m.).**

**111-1, Pg ID 1296, Canter Email, 3/23/19 @ 11:14 a.m.).**

Far from "trading favors," Hastings and Fleser wanted accessibility problems to be "caught in the design or building inspection phase" and had wanted to be involved "on the front end" to *avoid* such "missed opportunities." **(R. 115-5, Pg ID 1603, Hastings Email, 11/30/18 @ 9:46 a.m.; R. 115-12, Pg ID 1632, Fleser Email, 12/5/18 @ 8:51 a.m.).** Peterson acknowledged that the City *"could have encouraged the developer to do better in terms of accessibility.* **(R. 111-1, Pg ID 1294-1205, Peterson Email, 3/22/19 @ 2:43 p.m.).**

Consistent with these goals, Peterson's email of March 22, 2019, included the "solution" of DNWM agreeing "to partner with the Muskegon Building Department as a resource for ADA compliance." **(R. 111-1, Pg ID 1294-1295, Peterson Email, 3/22/19 @ 2:43 p.m.).** As Peterson observed, *"while things will meet the minimum code, there still may be a better way to comply with the ADA rules while further improving accessibility beyond the minimum* [and] *Disability Network West Michigan would be in favor of teaming with us to help make this happen."* **(R. 111-1, Pg ID 1295, Peterson Email, 3/22/19 @ 2:43 p.m.).**

Yet the City also remained willing to hear from Canter too. The City took the step of scheduling an in-person meeting for Canter with Peterson and other City officials. **(R. 111-1, Pg ID 1297, Dwana Thompson Email, 4/1/19 @ 11:24 a.m.).** That meeting of April 5, 2019, is documented by Canter's own audio recording. **(R.**

**109-14, Pg ID 1214, Audio Recording**).

The recording reveals that Canter had a host of "grievances" regarding accessibility issues around the City. Specific complaints regarding the HSC were raised, too.

Although Peterson expressed regret that contacts with Canter have tended to be "adversarial," he agreed to Canter's demands throughout the meeting. Canter complained that Brad Hastings was getting review access to building plans, while she was not. (**Audio Recording Time Code 22:14-22:28**). Peterson agreed that Canter should be treated "equally," so he agreed that Canter could come to the City offices and review plans as well. (**Audio Recording Time Code 23:05-23:22**).

> Peterson states:
>
> I'll tell you what I'm going to do. You want to pick a day a week, you want to call us. Any plan that's come in that week, I'll have them in this room sitting here waiting for you to look at. Okay? And if you want me to do the same thing to Brad, I'll do it for Brad. Brad can come to this room and look at them. . . . We'll treat everybody equally.
>
> (**Audio Recording Time Code 20:05-20:22**).

Peterson reiterated this twice more. (**Audio Recording Time Codes 1:11:00-1:11-50, 1:26:00-1:26:40**). It will be remembered, of course, that Briggs had already offered this arrangement to Canter four months earlier. (**R. 106-3, Pg ID 914-915, Briggs Email, 11/28/28 @ 3:37 p.m.**).

Despite the frequent emails of which Canter had been a recipient, *and* despite

the special meeting itself, Canter accused Peterson and the City of not *"engaging"* with her.  **(Audio Recording Time Code 51:43-51:55)**.  Manifestly Peterson and the City *had* "engaged" with Canter - - repeatedly.

But engagement is not really the issue.  Rather, Canter's position is that the City must *agree* with her that the Heritage Square Commons does not satisfy the 60% "accessible" entrances requirement of the 2010 ADA standards (*the result Canter wants*).  Canter insists that any contrary position must necessarily be "retaliation" against her advocacy in violation of her rights.

As Canter stated, the fact that the City does not agree with her means that "there's obviously something else going on here."  **(Audio Recording Time Code 56:50-57:01)**.  In Canter's mind, this "something else" is the supposed "conspiracy" to "retaliate."

Canter also made clear her objection to the involvement of the DNWM and Hastings altogether, stating that "they don't speak for us."  **(Audio Recording Time Code 11:46-11:50)**.  Canter doubled down on her accusation that Hastings "wet his pants" and "sold out" the disabled.  **(Audio Recording Time Code 1:21:14-1:22:06)**.  Peterson pointed out that it is "difficult to engage" with Canter given such manner of discourse.  *Id*.  Yet, despite remaining committed to the interpretation of Briggs and Hastings that the "60%" requirement of the 2010 ADA standards is satisfied at the HSC, Peterson otherwise agreed to accommodate the demands stated

by Canter at the meeting.

Again, there is no evidence in the record that Canter ever took advantage of the City's repeated offers for her to review plans or meet with Briggs. But the DNWM, through Hastings, took steps to fulfill the goals emphasized by Fleser - - i.e., "to work with communities to educate them on their responsibilities" and "to work upstream to ensure [accessibility] considerations are at the forefront of plans and concept development." **(R. 103-8, Pg ID 678-679, Fleser Email, 3/5/19 @ 4:04 p.m.).**

Hastings made a presentation to a work session of the City Commission "regarding a proposed cooperation agreement," whereby DNWM would "help the City and its customers to meet the minimum requirements of the Construction Coded and the ADA . . . aimed at increasing the inclusiveness and accessibility of our built environment and realizing the ultimate vision of access for all, regardless of ability." **(R. 111-4, Pg ID 1333, City Commission Work Session Minutes, 8/12/19).** An agreement to that purpose was approved by the City Commission on August 27, 2019. **(R. 111-4, Pg ID 1329-1330, City Commission Meeting Minutes, 8/27/19).** The agreement called for a payment to DNWM of $7,500.00 for these services. **(R. 111-4, Pg ID 1330, City Commission Minutes, 8/27/19).**

Canter was enraged. In a FOIA request, Canter accused that:

> Disability Network West Michigan *is a criminal enterprise* that is speaking on behalf of the disability

community without authorization, expertise, or authority. They are *selling falsified access reviews for cash payments*. That's not how we do things in the disability community. I am very dismayed to learn that the *city is financing their illegal activity with taxpayer dollars*. It sounds like no one even knows the scope of work of this contract or the expected outcomes. *This looks a lot like a payoff to avoid the city's responsibilities under the law* in exchange for a promise not to report violations (I assume, because that's the deal DNWM makes with local business).

This is outrageous. This is bordering on serious corruption.

**(R. 103-14, Pg ID 698, Canter Email, 8/27/19 @ 9:12 p.m.,** *emphasis added***).**

Then, six weeks later, Canter sent a letter to the FBI with the accusation that:

I believe that Disability Network West Michigan (hereafter DNWM), a federally-funded Center for Independent Living, is engaged in a criminal enterprise and conspiracy to cover up violations of the ADA, Rehabilitation Act, and Michigan Building Code. . . . [T]he organized effort to cover-up violations of state and federal law, as well as the potential for bribery of a City contractor should warrant the FBI's attention.

. . .

**The Quid Pro Quo**

Disability Network West Michigan helps entities find a way to avoid their responsibilities under the law. In return, they get paid by the entities that benefit from the crime: local governments, local business owners, and contractors.

**(R. 111-13, Pg ID 1389, 1392, Canter Letter to FBI, 10/16/19, pp. 1, 4).**

She accused the City of "[p]aying DNWM not to report violations" (in apparent reference to the $7,500.00 payment). **(R. 111-13, Pg ID 1392-1393, Canter Letter to FBI, 10/16/19, pp. 4-5).**

By this time, the DNWM had had enough of Canter's accusations. Concerned for the detriment such accusations posed for the DNWM and its ability to serve the disabled community, the DNWM chose filed a defamation suit against Canter in state court. **(R. 103-7, Pg ID 674, Fleser Declaration, ¶ 8; R. 103-13, Pg ID 695, Fleser Affidavit, ¶ 5; R. 103-17, Pg ID 715-722, DNWM Defamation Complaint).** The state court denied both parties' motions for summary disposition. But the court agreed that, if a jury believed Canter's accusations to be false, those accusations would constitute defamation. **(R. 103-18, Pg ID 739-747, State Court Opinion Denying Cross Motions for Summary Disposition; R. 103-19, Pg ID 749-751, State Court Opinion Denying Reconsideration).** Nevertheless, the DNWM leadership decided to voluntarily dismiss the case and focus upon serving its clientele rather than spend more money fighting Canter. **(R. 103-7, Pg ID 675, Fleser Declaration).**

In her Complaint, Canter attributed to Peterson and the City several adverse actions that she claims manifest the supposed conspiracy to retaliate against her.[4] In

---

[4] These were vague allegations that the City removed Canter from a "committee," singled Canter out for "disparate treatment" of FOIA requests, and excluded Canter

her brief to this Court, however, Canter focuses entirely upon her accusation that the City and Peterson encouraged and funded what Canter calls the "collaborative sham litigation" - - i.e., the defamation lawsuit - - by the DNWM.  **(Appellant Canter's Brief, pp. 36, 51-54, *and particularly* 62-64).**[5]

Specifically, Canter cites the minutes of an April 3, 2019, meeting of the DNWM Board of Directors at which a motion was passed to contact the DNWM's own attorney about a "cease & desist" (and a summons) and to "[c]onnect with City of Muskegon attorney."  **(R. 115-35, Pg ID 1701, DNWM Board of Directors Meeting Minutes, 4/3/19).**  But there is no reference to Canter in this motion or anywhere else in the minutes.

Moreover, this DNWM motion was passed at a meeting five months before the DNWM attorney sent a retraction letter to Canter and six months before the DNWM defamation suit against Canter was filed. There is no temporal association.

With no actual evidence, Canter speculates that "I don't think that Disability

_____

from "civic engagement."  **(R. 1, Pg ID 22, 27, ¶¶ 89-90, 123).**  Canter abandoned these matters in the district court, by failing to develop them in her response to the City's and Peterson's motion for summary judgment - - in opposition to which Canter did no more than mention a request to attend committee meetings by "telephone," which the City attorney determined would violate Michigan's Open Meetings Act. **(R. 111, Pg ID 1238, Canter Response Brief, p. 8; R. 109-7, Pg Id 1142, Bailey Email, 7/16/19 @1:32 p.m.).**

[5] This is consistent with Canter's Complaint, which pleaded specific allegations of fact only with regard to what she labeled the "Strategic Retaliatory State Court Litigation." **(R. 1, Pg ID 24-26, Complaint, ¶¶ 98-115).**

Network West Michigan could have initiated this lawsuit, and then take it as far as they did, without encouragement and support from pretty powerful players." **(R. 109-1, Pg ID 992, Canter Dep., 8/5/21, p. 78)**. She conjectures that the purpose of the August 27, 2019, agreement between the City and the DNWM was to provide funding for the lawsuit through the $7,500.00 payment. **(Appellant Canter's Brief, pp. 62-63)**. She testified that "I think it is very obvious from the emails that the money from that contract was used to fund this lawsuit." **(R. 109-2, Pg ID 1025, Canter Dep., 8/11/21, p. 25)**.

But the lawsuit is not mentioned in *any* email on the record. Canter's counsel openly admitted on the record that "*I have no direct e-mail about litigation.*" **(R. 140, Pg ID 2879, Motion Hearing Transcript, 9/22/22, p. 25)**.

And Canter admitted at deposition that she never obtained any document showing how the DNWM funded the lawsuit. **(R. 109-1, Pg ID 993, Canter Dep., 8/5/21, p. 82)**. She conceded that how the DNWM paid for the defamation lawsuit remains an "open question." **(R. 109-2, Pg ID 1024, Canter Dep., 8/11/21, p. 24)**.

In short, Canter has no email, no documents and no testimony beyond her own speculation that the City had any involvement in the DNWM's defamation lawsuit.

It should also be observed that Canter misrepresents the Defendants-Appellees' position regarding the entrances to the HSC. As revealed by the emails, none of the parties' disputes that the 2010 ADA standards require 60% of the HSC

public entrances be accessible to the disabled. This was highlighted in Briggs' email of November 28, 2018. **(R. 106-3, Pg ID 914-915, Briggs Email, 11/28/19 @ 3:37 p.m.).** This has been the position of Hastings beginning with his first email on November 30, 2018. **(R. 115-5, Pg ID 1603, Hastings Email, 11/30/18 @ 9:46 a.m.; R. 111-1, Pg ID 1202, Hastings Email, 3/21/19 @ 4:04 p.m.).** Peterson, quite reasonably, agreed with Briggs and Hastings as the individuals with expertise.

Where the parties disagree is whether all of the five entrances by which the Defendants make their 60% calculation constitute "public entrances." **(See R. 111-1, Pg ID 1292, Hastings Email, 3/21/19 @ 4:04 p.m.).** Canter targets Hastings supposed position that "locked doors count as accessible public entrances." **(R. 103-3, Pg ID 632, Canter Dep., 9/18/20, pp. 97-98).**

Of course, neither Hastings, nor Briggs, ever took the position that "locked doors" are accessible public entrances. Briggs was specific from the start that the accessible door providing access to Drip Drop Drink "should be left unlocked during business hours." **(R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:38 p.m.).** Hastings likewise emphasized that the accessible route "needs to be unlocked during business hours." **(R. 115-11, Pg ID 1630, Hastings Email, 12/11/18 @ 4:53 p.m.).** Hastings later confirmed this with his sources at the Access Board. **(R. 115-27, Pg ID 1656, Hastings Email, 3/12/19 @ 3:19 p.m.).**

Without citation to the record, Canter asserts that "[n]either Briggs or Peterson

ever told Post that he could not keep those entrances locked." (**Appellant Canter's Brief, p. 61**). This is demonstrably false. Briggs did tell Post. (**R. 106-3, Pg ID 911, Briggs Email, 11/26/18 at 4:38 p.m., R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:54 p.m.; R. 115-9, Pg ID 1628, Briggs Email, 12/12/18 @ 2:52 p.m.**). With Briggs having spoken, the City's position was stated, without Peterson saying more.

Manifestly, neither Briggs, nor Hastings, nor Peterson, nor the City, have ever taken the position that "locked doors count as accessible public entrances." Rather, they have interpreted §206.4.7 of the 2010 ADA standards to meet that certain entrances labeled by Canter as "restricted" are actually "public" for purposes of the 60% calculation (if, of course, they are kept unlocked, as Post repeatedly indicated they would be). (**R. 111-1, Pg ID 1292, Hastings Email, 3/21/19 @ 4:04 p.m.; R. 106-3, Pg ID 914-915, Briggs Email, 11/28/18 @ 3:37 p.m.; R. 111-1, Pg ID 1294-1295, Peterson Email, 3/22/14, @ 2:43 p.m.**).

Again, Briggs had stated this position on behalf of the City on November 26, 2018 - - two days before Hastings and Fleser even became involved. (**R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:38 p.m.; R. 115-5, Pg ID 1603, Hastings Email, 11/30/18 @ 9:46 a.m.; R. 115-12, Pg ID 1632, Fleser Email, 12/5/18 @ 8:51 a.m.**). The City did not adopt that position as part of any "conspiracy." The City, through Briggs, had determined that interpretation of the 2010 ADA standards on its own.

And this remains the City's position. When contacted by the Michigan Bureau of Construction Codes in September 2019 following a complaint to that agency by Canter, Briggs responded that:

> Regarding the Heritage Square Commons that is one building that contains a few businesses, this building was designed with three of the five entrances as ADA compliant. *We are having a hard time keeping the owner in compliance with the ADA as they lock doors and such.* We have sent a notice for them to respond in writing as to how they are going to bring the building back into compliance.
>
> **(R. 115-55, Pg ID 1850, Briggs Letter, 9/12/19)**.

The position of the City has remained unchanged from the beginning. Manifestly, the position taken by the City and Peterson does <u>not</u> arise from any retaliatory "conspiracy."

It is the position of the City of Muskegon and Franklin Peterson that the district court properly rejected Canter's speculative and fanciful interpretation of the record. The district court's grant of summary judgment in favor of the City and Peterson should be affirmed.

## SUMMARY OF ARGUMENT

Relying upon a conjectural interpretation of the emails, Canter contends that her case must go to a jury, because the Defendants have not "foreclosed the possibility" that a jury might believe Canter's "inferences" of conspiracy and retaliation. **(Appellant Canter's Brief, pp. 30-32, 46)**. With regard to Defendants-Appellees Franklin Peterson and the City of Muskegon, Canter argues that the emails, together with minutes from separate meetings of the City Commission and the Co-Defendant Disability Network West Michigan, demonstrate conspiratorial retaliation against Canter in the form of encouragement and funding of a defamation lawsuit by the DNWM against Canter.

As recognized by the district court, Canter's claims necessarily fail, because her "inferences" are mere speculative leaps that are not supported by her evidence. *K.V.G. Properties, Inc. v. Westfield Insurance Co.*, 900 F.3d 818, 823 (6th Cir. 2018). Canter mistakenly believes that the "motive" element of conspiracy and retaliation lessens her evidentiary burden by requiring the Defendants-Appellees to disprove her conjectures. But this is not true.

The Defendants-Appellees are not required to negate the elements of Canter's claims. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). Rather, it remains the obligation of Canter to put forth actual evidence, beyond conjectural inference, to support her conspiracy and retaliation allegations. *Crawford-El v.*

*Britton*, 523 U.S. 574, 600 (1998). "[S]peculation is insufficient to survive summary judgment." *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 305 (6th Cir. 2021).

What Canter identifies as "retaliation" is simply that the City and Peterson did not agree to adopt Canter's interpretation of the Americans with Disabilities Act accessibility standards for the HSC building. But "[a] citizen's right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). Where the substance of a retaliation claim is predicated upon the refusal of a governmental agency or official to act on or adopt a citizen's views, the plaintiff's claims are not even "plausible" and can be dismissed as frivolous. *Id.*, at 479-80.

Furthermore, even if Canter's inferences were indulged as plausible, neither Peterson nor the City can be held liable. Peterson has qualified immunity, (1) because he reasonably relied upon interpretation of the ADA standards provided by Briggs. *Pearson v. Callahan*, 555 U.S. 223, 231-232 (2009). The City cannot be held liable, (1) because Canter has no evidence to show the existence of an unconstitutional City "policy" of retaliation and (2) because neither Peterson (nor any other City official) is shown by the evidence to have deprived Canter of any constitutional or statutory right. *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 403-4 (6th Cir. 2010).

## ARGUMENT

### I.   THE STANDARD OF APPELLATE REVIEW IS *DE NOVO*.

Defendants-Appellees Franklin Peterson and City of Muskegon sought summary judgment under Fed. R. Civ. P. 56. **(R. 108, Pg ID 940-941, Muskegon/Peterson Motion for Summary Judgment; R. 109, Pg ID 953-954, Muskegon/Peterson Brief, pp. 4-5, "Standard of Review").** The district court granted summary judgment as requested by the motion. **(R. 140, Pg ID 2933, Motion Hearing Transcript, 9/22/22, p. 79; R. 135, Pg ID 2761, Order; R. 136, Pg ID 2762, Judgment).**

A district court's grant of summary judgment is reviewed *de novo* on appeal. *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 667 (6th Cir. 2022). This Court uses "the same rule 56(c) standard as the district court." *Moldowan v. City of Warren*, 578 F.3d 351, 373 (6th Cir. 2009). Summary judgment is properly granted where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), *Puskas v. Delaware County, Ohio*, 56 F.4th 1088, 1093 (6th Cir. 2023).

### II.   PLAINTIFF-APPELLANT CANTER BEARS THE BURDEN OF PROOF FOR HER "CONSPIRACY" ALLEGATIONS.

Plaintiff-Appellant Canter asserts that "conspiracy" is "a question of fact." **(Appellant Canter's Brief, p. 29).** Relying upon *Adickes v. S.H. Kress & Co.*, 398

U.S. 144 (1970), Canter's argument is that the Defendants-Appellees failed to carry *their* supposed "burden" to "foreclose the possibility" of a conspiracy. (**Appellant Canter's Brief, pp. 30-31, 32-33**).  Canter's argument fails.

First, after the *Adickes* decision, the Supreme Court clarified that:

> "Rule 56 does <u>not</u> require the moving party to *negate* the elements of the nonmoving party's case; to the contrary, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as *whatever* is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."

> *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990), *emphasis added*.

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*

It was <u>not</u> the obligation of the *Defendants* to negate the existence of the "conspiracy" alleged by Canter.  Rather, it was *Canter's* obligation to present evidence to support her allegation. The question is whether the evidentiary record supports Canter's "inference of conspiracy," not whether the Defendants "foreclosed the possibility" of one.

Second, Canter mistakenly believes that the "motive" element of a conspiracy claim lessens her evidentiary burden at the summary judgment stage.  (**Appellant**

**Canter's Brief, pp. 43-45**). To the contrary, however, the Supreme Court has made clear that "the plaintiff may not respond simply with general attacks upon the defendants' credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

Finally, "it is well established . . . that a party may not avoid summary judgment by resorting to speculation, conjecture, or fantasy." *K.V.G. Properties, Inc. v. Westfield Insurance Company*, 900 F.3d 818, 823 (6th Cir. 2018). "Trials exist to resolve concrete factual disputes, not to satiate the endless imagination of trial lawyers." *Id.* "[S]peculation is insufficient to survive summary judgment." *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 305 (6th Cir. 2021).

In Canter's mind, the "conspiracy" is "obvious" from the emails described above. (**R. 109-1, Pg ID 995-6, 998, Canter Dep., 8/5/21, pp. 92-93, 101, 104**). Neither the emails, nor the other evidence upon which Canter relies, raise any "inference of conspiracy" at all.

### III.    THE EVIDENTIARY RECORD DOES NOT SUPPORT ANY "INFERENCE OF CONSPIRACY."

Canter did not plead "conspiracy" as an independent theory of liability in her Complaint. Rather, she relies upon her allegation of conspiracy to render each Defendant jointly liable for the supposed conspiratorial actions of the others. See

*Beck v. Prupis*, 529 U.S. 494, 503 (2000).

In any context, a plaintiff claiming damage from a conspiracy must demonstrate (1) that a single plan existed, (2) that the alleged conspirators shared a conspiratorial objective to deprive the plaintiff of their constitutional rights, and (3) that an overt act was committed in furtherance of the conspiracy that caused the injury. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). But a conspiracy is not shown, where the alleged conduct of the defendants "is just as consistent with independent conduct as it with a conspiracy." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012).

There is no evidence that the City or Peterson conspired to encourage, assist or fund the DNWM defamation lawsuit against Canter. There is no evidence that the DNWM needed any financial assistance from the City of Muskegon or that the $7,500.00 payment under their agreement had been intended (or directed) for that purpose.

Moreover, the filing of the lawsuit by the DNWM is just as consistent with nonconspiratorial, independent action by the DNWM as with any supposed conspiracy. Canter had repeatedly accused the DNWM, Hastings and Fleser of illegal and criminal actions. Such accusations of criminality are defamation per se under Michigan law. *TT v. KL*, 334 Mich. App. 413, 444, 965 N.W.2d 101, 117 (2020), *Burden v. Elias Brothers Big Boy Restaurants*, 240 Mich. App. 723, 727-

8, 613 N.W.2d 378, 381 (2000), *Armstrong v. Shirvell*, 596 Fed. Appx. 433, 448-9 (6th Cir. 2015).

Given the potential damage of such accusations to its own reputation and advocacy, the DNWM needed no encouragement to sue Canter. The DNWM's action in doing so is completely consistent with action independent of any supposed "conspiracy".

Canter references the minutes of the April 2019 meeting of the DNWM Board and the a motion to contact City attorneys regarding some "cease and desist" and "summons". **(Appellant Canter's Brief, pp. 52-3, 63, referencing R. 115-35, Pg ID 1701, DNWM Board of Directors Meeting Minutes, 4/3/19)**. But those meeting minutes make no reference to Canter. Nor is there any evidence that any representative of the DNWM ever contacted City attorneys regarding *whatever* the referenced minute entry was about.

Moreover, this DNWM Board Meeting took place six months before the DNWM filed its defamation action against Canter. Canter cannot rely on any "temporal proximity" argument to tie the DNWM minutes to the DNWM defamation lawsuit.

With regard to the underlying dispute between Canter and the City, Canter claims that the emails make the conspiracy "obvious." In reality, the emails do precisely the opposite.

The emails show that the City, through Briggs (as its contracted building official), was aware of the 2010 ADA 60% accessible entrances standard, before any documented involvement by the DNWM, Fleser or Hastings. Certainly, Hastings came to the same interpretation as Briggs. But neither Briggs (nor Peterson and the City) needed to conspire with Hastings to come to that interpretation. On the evidentiary record, Briggs came to the conclusion first.

Moreover, Briggs' correspondence to the Michigan Bureau of Construction Codes in September 2019, demonstrated that the City *agreed* with Canter that the HSC *not* compliant, as long as there was an issue with doors being locked. **(R. 115-55, Pg ID 1850, Briggs Letter, 9/12/19).** The City, through Briggs, thus *supported* the position stated by Canter in her deposition. **(R. 109-2, Pg ID 1050-1051, Canter Dep., 8/11/21, pp. 50-51; R. 103-3, Pg ID 632-633, Canter Dep., 9/18/20, pp. 100-101).** This had been the City's position from the start to the present. **(R. 106-3, Pg ID 911, Briggs Email, 11/26/18 @ 4:38 p.m.; R. 115-55, Pg ID 1850, Briggs Letter, 9/12/19).**

Obviously, Canter disagrees with the City's interpretation of the ADA "60%" requirement. But Canter has no evidence to support any "inference" that the City reached its position, or denied Canter her desired "result" (or played any role in the DNWM lawsuit) as part of any "conspiracy" with the other Defendants-Appellees.

## IV. THE EVIDENTIARY RECORD DOES NOT SUPPORT ANY FINDING OF "RETALIATION" BY FRANKLIN PETERSON OR THE CITY OF MUSKEGON.

As Canter herself acknowledges, "[r]etaliation claims arise in any number of contexts . . ., but the essential framework remains the same." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386-7 (6th Cir. 1999). "A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements 1 and 2 - - that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.*, at 394.

There is no dispute that the right to petition government agencies and officials for redress of claimed grievances is protected by the First Amendment. U.S. Const. amend. I. For matters within their purview, the Americans with Disabilities Act and Rehabilitation Act protect submission of grievances as well. 42 U.S.C. §12203(a), 29 C.F.R. §33.13.

But Canter's claims fail with regard to the second two elements of a retaliation claim. Canter has no evidence to show any adverse action by Peterson or the City that was causally connected to Canter's complaints regarding accessibility at the HSC.

### A. Canter has no evidence to support the "adverse action" element of her claim.

For purposes of a retaliation claim an "adverse action" is an action that "would chill or silence a person of ordinary firmness" from pursuing their petitions to the government. *Thaddeus-X*, 175 F.3d at 33. "This standard is amenable to all retaliation claims." *Id.*

Of particular relevance for the present case, however, "[a] citizen's right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). Indeed, where the substance of a retaliation claim is predicated upon the refusal of a government agency or official to act on or adopt a citizen's views, the plaintiff's claim is not even "plausible" and can be dismissed as frivolous. *Id.*, at 479-80.

Canter's complaint recited a number of vaguely defined instances of supposed adverse actions toward her by the City of Muskegon and Peterson. In her brief to this court, however, Canter's discussion of "adverse action" by the City and Peterson focuses entirely upon the supposed encouragement and funding of the DNWM defamation lawsuit. **(Appellant Canter's Brief, pp. 52, 63-4)**. Canter has abandoned any issue or argument with regard to any supposed "adverse action" apart

from the DNWM lawsuit. *U.S. v. Johnson*, 440 F.3d 832, 845-6 (6th Cir. 2006).[6]

As described above, Canter has no evidence that the City or Peterson were ever aware of or involved in the DNWM lawsuit at all, much less that they encouraged or funded it. Canter's argument is nothing more than "speculation, conjecture or fantasy" that cannot defeat summary judgment in favor of the City and Peterson. *K.V.G. Properties, Inc.*, 900 F.3d at 823.

Apart from the speculative allegation of involvement by the City and Peterson in the defamation lawsuit, Canter's retaliation claim boils down to the mere fact that Peterson and the City have not agreed with her interpretation of the 2010 ADA standards for accessible entrances as they apply to the HSC. Canter ultimately defines the supposed "adverse action" as the Defendant adopting a contrary position that "effectively closed down all avenues whereby the underlying issue could be addressed," - - i.e., whereby Canter would get her desired result. **(Canter Appellant Brief, p. 44)**. But, even if true, this is not an "adverse action."

Canter has no right to compel Peterson or the City "to act on or adopt" her

---

[6] In their summary judgment motion, the City of Muskegon and Peterson confronted Canter's vague allegations regarding a "committee," "civic engagement" and Freedom of Information Act requests. **(R. 109, Pg ID 950-951, 961-963, City/Peterson Motion for Summary Judgment, pp. 1-2, 12-14)**. In response, Canter mentioned only that accommodation had been denied by reference to the Open Meetings Act, and she offered no argument on the point at all. **(R. 111, Pg ID 1238, Canter Response, p. 8)**. She thus abandoned other claims of "adverse action" in the court below.

interpretation. *Apple*, 183 F.3d at 479-80. Therefore, refusal by the City and Peterson to do so does not constitute an adverse action for purposes of a retaliation claim.

Moreover, Canter's own testimony undermines her claim. As she testified at deposition, *"I'm still allowed to speak"* and *"I'm still doing advocacy right now."* **(R. 109-2, Pg ID 1058, Canter Dep., 8/11/21, p. 58)**. Her advocacy has not been "chilled." And the evidentiary record shows that Peterson and the City have always been willing to hear her advocacy.

## B. Canter has no evidence to support the "causal connection" element of her claim.

Even if this Court were persuaded that Canter has presented evidence of an "adverse action" by the City and/or Peterson, her retaliation still fails. "To prevail on such a claim, a plaintiff must establish a causal connection between the government defendants retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, __ U.S. ___, 139 S. Ct. 1715, 1722 (2019), *internal quotes omitted.* Canter cannot show the requisite causal connection.

Canter highlights that a retaliatory motive need not be the sole motivating factor for any adverse action. **(Appellant Canter Brief, p. 45)**. But she ignores the requirement that retaliatory motivation must be the "but for" cause of the allegedly adverse action. *Nieves*, 139 S. Ct. at 1722. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012), *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). "It is not enough to show that an official acted with a retaliatory

motive and that the plaintiff was injured." *Nieves*, 139 S. Ct. at 1722. Rather, Canter

must show that the alleged adverse action "would not have been taken absent the

retaliatory motive." *Id.*

Although Peterson and the City disagreed with the result demanded by Canter,

this resulted from the City's independent interpretation of the ADA requirements as

determined by Briggs. That *interpretation*, <u>not</u> "retaliation," is the *cause* for the

denial of Canter's desired result.

Even if Canter had evidence of some "adverse action," the City and Peterson

would nevertheless be "entitled to prevail on summary judgment," upon showing

that they "would have taken the same action in the absence of [Canter's] protected

activity." *Thaddeus-X*, 175 F.3d at 399. This is a necessary second step in causation

analysis. *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274,

287 (1997). Demonstrably, the City and Peterson would have taken the same actions

of denying Canter her desired result because of their interpretation of the ADA,

wholly apart from Canter's advocacy or any retaliatory animus toward it.

Moreover, the record fails to show any retaliatory animus toward Canter's

advocacy at all. The special meeting to hear Canter's grievances, and the offers from

both Briggs and Peterson for Canter to review and comment upon plans submitted

to the City, shows a continued willingness to engage with Canter's advocacy.

Completely ignoring the analytical context, Canter cites *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133 (2000), to contend that she's entitled to put her case before a jury to see whether or not they believe the Defendants' denial of a retaliatory motive. **(Appellant Canter's Brief, p. 46)**. But the language quoted by Canter from *Reeves* deals with the third step of the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for discrimination cases. Under that framework, a plaintiff must establish a *prima facie* case of discrimination, following which the defendant can produce evidence of a nondiscriminatory motive for its actions. *Reeves*, 530 U.S. at 142-3. This is followed by the third step in which the plaintiff is afforded the opportunity to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*, at 143.

With regard to alleged First Amendment retaliation, *Reeves* is irrelevant, because the *McDonnell Douglas* framework does not apply. *Dye v. Office of Racing Commission*, 702 F.3d 286, 294-5 (6th Cir. 2012). More importantly, even in the ADA (or Rehabilitation Act) context, where *McDonnell Douglas* burden-shifting could apply, Canter's case still fails, because her evidence neither supports a *prima facie* case of retaliation, nor any allegation of pretext.

"A jury verdict based on speculation, supposition, or surmise is impermissible." *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880

F.3d 791, 801 (6th Cir. 2018). But that is precisely what Canter wants a jury to do in her case.

Canter's claim of "retaliation" fails, because her "evidence" fails to show any adverse action causally connected to her advocacy. The grant of summary judgment to the City and Peterson should be affirmed.

## V. FRANKLIN PETERSON IS ENTITLED TO QUALIFIED IMMUNITY AGAINST CANTER'S CLAIMS.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The issue of an official's qualified immunity invokes a two-pronged inquiry. On the one hand, "a court must decide whether the facts that the plaintiff has alleged or shown make up a violation of a constitutional right." *Id.*, at 232. On the other hand, "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* "A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity." *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017).

In the qualified immunity context, a right is "clearly established" only where the existing case law precedents demonstrate the existence of the right to be "beyond

dispute," such that "every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Moreover, qualified immunity "covers mistakes in judgment, whether the mistake is one of fact or one of law." *Pearson*, 555 U.S. at 231.

Franklin Peterson is the City Manager, not a building official. He has not claimed any expertise with regard to building codes or the ADA in this case.

Instead, the City contracted for the services of Kirk Briggs as the City's building official. Briggs determined the HSC to be compliant with the 2010 ADA standards, particularly the 60% accessible entrances requirement. His opinion was bolstered by contact with state-level officials and by Hastings (supported by the federal officials he consulted).

Whether or not Briggs, Hastings and the state and federal officials they consulted are correct, it was reasonable for Peterson to accept their conclusions on the matter. There is no case law requiring an administrative or executive official to second-guess the technical opinions of those hired by their agencies for their expertise.

As a consequence, Peterson has qualified immunity for acting in accordance with the conclusions of Briggs as the City's contracted building official. Even if Peterson was mistaken as a matter of fact or law in this regard, he is covered by immunity. *Pearson*, 555 U.S. at 231.

## VI.    THERE IS NO BASIS FOR MUNICIPAL LIABILITY ON THE PART OF THE CITY OF MUSKEGON.

A municipal entity cannot be held liable under a theory of *respondeat superior* for the actions of its officials.  *Monell v. Dept of Social Services of City of New York*, 436 U.S. 658, 691 (1978).   Rather, Canter must show that the City of Muskegon *itself* is the wrongdoer.  *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 403 (6th Cir. 2010).   To hold the City liable, Canter must (1) identify a retaliatory policy or custom, (2) connect that policy to the city, and (3) show that her injury was caused by execution of that policy.  *Id.*

In the present case, Canter has not shown any policy of the City.  Rather, she claims that Franklin Peterson, as City Manager, joined in a conspiracy to retaliate against her advocacy.

But where a municipality's liability "is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."  *Range v. Douglas*, 763 F.3d 573, 592 (6th Cir. 2014).  If the municipal employee did not engage in unconstitutional action, the City cannot be liable.  *Id.*, *Vereecke*, 609 F.3d at 404, *Tucker v. City of Richmond, Kentucky*, 388 F.3d 216, 224 (6th Cir. 2004).

In this case, there is no evidentiary support for Canter's allegations of conspiracy and retaliation by Peterson.  Therefore, whether Peterson's actions are

viewed as those of an individual government employee or as the product of some City policy, there is no basis for municipal liability. No constitutional tort has occurred.

### VII. THE DISTRICT COURT CORRECTLY DISMISSED CANTER'S STATE-LAW CLAIM UNDER MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT.

There is no basis for Canter's argument that the dismissal of her PWDCRA claim should be reversed. The district court properly granted summary judgment against Canter's federal claims. Once a federal court has dismissed a plaintiff's federal-law claims, the court "should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006), *Winkler v. Madison County*, 893 F.3d 877, 905 (6th Cir. 2018), *Burnett v. Griffith*, 33 F.4th 907, 915 (6th Cir. 2022).

### VIII. THERE IS NO BASIS FOR AN ADA COMPLIANCE CLAIM AGAINST THE CITY OF MUSKEGON OR PETERSON.

Canter's argument regarding "actual ADA compliance" is vague and tied to her mistaken conceptualization of her burden of proof. **(Appellant Canter's Brief, pp. 59-60)**. Canter has the option to press a compliance claim against Post and/or the HSC. Indeed, Hastings (*defying the notion of any conspiracy among the Defendants*) specifically reminded Canter that she could do so - - i.e., "P.S. If you think they are violating the ADA, please note that you can file a complaint against a

title III entity with the United States Department of Justice." **(R. 115-24, Pg ID 1649, Hastings Email, 3/5/19 @ 4:18 p.m.).**

But the Heritage Square Commons is not owned by the City or Peterson. As Canter herself admits, the City of Muskegon and its municipal officials "are not responsible for enforcement of the ADA." **(R. 109-1, Pg ID 997, Canter Dep., 8/5/21, p. 100).** The enforcing agency is the federal Department of Justice. *Spector v. Norwegian Cruise Line, Ltd.,* 545 U.S. 119, 161 (2005).

*If* there is an ADA compliance issue at the HSC (e.g., locked doors or too few accessible entrances), Canter's recourse is against the building owners and/or the tenants. Her recourse is not against the City and Peterson.

## CONCLUSION AND RELIEF REQUESTED

For the reasons described above, Canter's claims against Franklin Peterson and the City of Muskegon are based upon nothing but conjecture mixed with outright fantasy. The district court's grant of summary judgment to the City of Muskegon and Franklin Peterson should be affirmed.

s/Douglas J. Curlew
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Parkway
Livonia, MI 48152
Ph: (734) 261-2400
P39275
Primary Email: dcurlew@cmda-law.com
Attorneys for Defendants-Appellees City of Muskegon and Franklin Peterson

Dated:  March 23, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to the 6th Cir. R. 32(a)(7)(c), the undersigned certifies this brief complies with the type-volume limitations of 6th Cir. R. 32(1)(7)(B).

1. Exclusive of the exempted portions in 6th Cir. R. 32(a)(7)(B)(iii), the brief contains:

   A. 12,360 words.

2. The brief has been prepared:

   B. in proportionally spaced typeface using: "New Times roman" in font size 14.

> s/Douglas J. Curlew
> Cummings, McClorey, Davis & Acho, P.L.C.
> 17436 College Parkway
> Livonia, MI 48152
> Ph: (734) 261-2400
> P39275
> Primary Email: dcurlew@cmda-law.com
> Attorneys for Defendants-Appellees City of
> Muskegon and Franklin Peterson

Dated:  March 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  All Attorneys of Record; and I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:  N/A.

> s/Marie E. Jones
> Legal Assistant
> Cummings, McClorey, Davis & Acho, P.L.C.

## RECORD APPENDIX MAKING
## DESIGNATION OF DOCUMENTS

| Record Entry No./Page ID | Description |
| --- | --- |
| R. 1, Pg ID 1-30 | Complaint |
| R. 103-2, Pg ID 603-606 | Diane Fleser Affidavit, 11/13/20 |
| R. 103-3, Pg ID 607-639 | Eleanor Canter Deposition, 9/18/20 |
| R. 103-4, Pg ID 640-658 | Eleanor Canter Deposition, 9/22/20 |
| R. 103-5, Pg ID 659-665 | DNWM Blog Post Advertisement |
| R. 103-6, Pg ID 666-671 | Brad Hastings Affidavit |
| R. 103-7, Pg ID 672-676 | Diane Fleser Declaration |
| R. 103-8, Pg ID 677-680 | Emails |
| R. 103-13, Pg ID 693-696 | Diane Fleser Affidavit, 3/9/20 |
| R. 103-14, Pg ID 697-698 | Canter FOIA Email |
| R. 103-16, Pg ID 710-711 | Email |
| R. 103-17, Pg ID 712-737 | DNWM State Court Defamation Complaint, with Exhibits |
| R. 103-18, Pg ID 738-747 | State Court Opinion Denying Cross Motions |
| R. 103-19, Pg ID 748-751 | State Court Opinion Denying Reconsideration |
| R. 106-2, Pg ID 877-909 | City/SAFEBuilt Contract |
| R. 106-3, Pg ID 910-927 | Emails |
| R. 106-4, Pg ID 928-930 | Kirk Briggs Declaration |

| **Record Entry No./Page ID** | **Description** |
|---|---|
| R. 108, Pg IS 940-941 | City of Muskegon/Franklin Peterson Motion For Summary Judgment |
| R. 109, Pg ID 942-970 | City of Muskegon/Franklin Peterson Brief in Support of Summary Judgment Motion |
| R. 109-1, Pg ID 971-999 | Eleanor Canter Deposition, 8/5/21 |
| R. 109-2, Pg ID 1000-1097 | Eleanor Canter Deposition, 8/11/21 |
| R. 109-13, Pg ID 1208-1213 | Emails |
| R. 109-14, Pg ID 1214 | Audio Recording of April 5, 2019 Meeting |
| R. 111-1, Pg ID 1251-1312 | Emails |
| R. 111-4, Pg ID 1326-1333 | City Commission Minutes, 8/12/19 and 8/27/19 |
| R. 111-5, Pg ID 1334-1336 | City of Muskegon/DNWM Agreement |
| R. 111-9, Pg ID 1345-1380 | DNWM Amended State Court Complaint, With Exhibits |
| R. 111-13, Pg ID 1389-1433 | Eleanor Canter Letter to FBI, 10/16/19, with Attachments |
| R. 115-1, Pg ID 1593-1596 | Heritage Square Commons Photographs |
| R. 115-2, Pg ID 1597-1598 | Heritage Square Commons Diagram |
| R. 115-5, Pg ID 1603-1604 | Email |
| R. 115-6, Pg ID 1605 | Emails |
| R. 115-7, Pg ID 1622 | Emails |
| R. 115-9, Pg ID 1628 | Emails |

| Record Entry No./Page ID | Description |
|---|---|
| R. 115-10, Pg ID 1629 | Emails |
| R. 115-11, Pg ID 1630-1631 | Emails |
| R. 115-12, Pg ID 1632-1634 | Emails |
| R. 115-16, Pg ID 1639 | Email |
| R. 115-17, Pg ID 1640 | Email |
| R. 115-18, Pg ID 1641 | Email |
| R. 115-19, Pg ID 1642-1643 | Emails |
| R. 115-20, Pg ID 1644 | Emails |
| R. 115-21, Pg ID 1645 | Emails |
| R. 115-24, Pg ID 1524-1650 | Emails |
| R. 115-25, Pg ID 1651-1653 | Emails |
| R. 115-27, Pg ID 1656-1658 | Emails |
| R. 115-35, Pg ID 1700-1702 | DNWM Board of Directors Minutes, 4/3/19 |
| R. 115-55, Pg ID 1849-1850 | Briggs Correspondence Exchange with Bureau of Construction Codes |
| R. 131, Pg ID 2753-2757 | Joint Statement of Undisputed Facts |
| R. 135, Pg ID 2761 | Order |
| R. 136, Pg ID 2762 | Judgment |
| R. 140, Pg ID 2855-2974 | Motion Hearing Transcript, 9/22/22 |